In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 23-1020

UNITED STATES OF AMERICA,

**Plaintiff-Appellee,**

v.

HUAZHI HAN,

**Defendant-Appellant.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 18 CR 388 — Andrea R. Wood, *Judge.*

# BRIEF OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

STUART FULLERTON
Assistant United States Attorney

ALEXANDRA MORGAN
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

JURISDICTIONAL STATEMENT .................................................... 1

ISSUES PRESENTED FOR REVIEW ............................................... 2

STATEMENT OF THE CASE ........................................................... 2

    Offense Conduct ..................................................................... 2

    Charges Against Defendant ..................................................... 6

    Motion to Suppress ................................................................. 7

    Trial ...................................................................................... 11

    Threat Evidence .................................................................... 15

    Verdict and Sentencing ......................................................... 17

SUMMARY OF ARGUMENT ........................................................ 19

ARGUMENT .................................................................................. 21

    I.    The District Court Properly Denied Defendant's Motion To
        Suppress Evidence. ........................................................ 21

        A.    Standard of Review ..................................................... 21

        B.    Analysis ..................................................................... 21

    II.   The District Court Properly Admitted Evidence Of Defendant's
        Threats As Direct Evidence Of Charged Crimes. ............... 28

        A.    Standard of Review ..................................................... 28

        B.    Analysis ..................................................................... 28

    III.  The Challenged Remarks Of The Government During Closing
        Argument Were Not Improper And Could Not Have Had An
        Adverse Effect On The Verdict. ...................................... 35

A.    Standard of Review ..................................................... 35

B.    Analysis ............................................................... 36

CONCLUSION ............................................................. 42

# TABLE OF AUTHORITIES

## CASES

*Darden v. Wainwright*, 477 U.S. 168 (1986)......................................................... 40

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ............................................. 22

*United States v. Alviar*, 573 F.3d 526 (7th Cir. 2009) ............................... 40, 41

*United States v. Ambriz-Villa*, 28 F.4th 786 (7th Cir. 2022)......................... 22

*United States v. Arrellano*, 757 F.3d 623 (7th Cir. 2014) .............................. 25

*United States v. Biggs*, 491 F.3d 616 (7th Cir. 2007).................................... 26

*United States v. Cardena*, 842 F.3d 959 (7th Cir. 2016).......................... 29, 31

*United States v. Castro-Aguirre*, 983 F.3d 927 (7th Cir. 2020) ..................... 33

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ................................... 32

*United States v. Chaparro*, 956 F.3d 462 (7th Cir. 2020) ......................... 36, 40

*United States v. Chavez*, 12 F.4th 716 (7th Cir. 2021) ................................... 35

*United States v. Contreras*, 820 F.3d 255 (7th Cir. 2016)........................ 24, 25

*United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) ........................ 32, 33, 34

*United States v. Hicks*, 368 F.3d 801 (7th Cir. 2004)..................................... 33

*United States v. Hoover*, 246 F.3d 1054 (7th Cir. 2001) ................................ 29

*United States v. Johnson*, 89 F.4th 997 (7th Cir. 2024) ................................ 28

*United States v. Johnson*, 93 F.4th 383 (7th Cir. 2024) ................................ 21

*United States v. Johnson*, 427 F.3d 1053 (7th Cir. 2005) ......................... 26, 27

*United States v. Jackson*, 898 F.3d 760 (7th Cir. 2018) ..................... 33, 34, 37

*United States v. Jones*, 22 F.4th 667 (7th Cir. 2022) ................................ 22, 24

*United States v. McGraw*, 571 F.3d 624 (7th Cir. 2009)............... 21, 23, 24, 28

*United States v. McKenzie*, 922 F.2d 1323 (7th Cir. 1991) .............................. 40

*United States v. McKibbins*, 656 F.3d 707 (7th Cir. 2011) ............................ 33

*United States v. Mercado*, 53 F.4th 1071 (7th Cir. 2022) .............................. 21

*United States v. Miller*, 276 F.3d 370 (7th Cir. 2002)................................... 41

*United States v. Miller*, 688 F.3d 322 (7th Cir. 2012)................................... 35

*United States v. Olson*, 41 F.4th 792 (7th Cir. 2022)..................................... 26

*United States v. Raibley*, 243 F.3d 1069 (7th Cir. 2001) ............................... 28

*United States v. Rogers*, 587 F.3d 816 (7th Cir. 2009)................................... 32

*United States v. Sabo*, 724 F.3d 891 (7th Cir. 2013)...................................... 27

*United States v. Tanner*, 628 F.3d 890 (7th Cir. 2010)............................. 37, 39

*United States v. Taylor*, 31 F.3d 459 (7th Cir. 1994) .................................... 25

*United States v. Thomas*, 986 F.3d 723 (7th Cir. 2021)................ 29, 30, 32, 35

*United States v. Villegas*, 388 F.3d 317 (7th Cir. 2004)................................. 27

*United States v. Walls*, 225 F.3d 858 (7th Cir. 2000)..................................... 27

*United States v. Wolfe*, 701 F.3d 1206 (7th Cir. 2012) .................................. 37

*United States v. Young*, 470 U.S. 1 (1985)...................................................... 36

## STATUTES

18 U.S.C. § 1956..............................................................................1, 7

18 U.S.C. § 1960...........................................................................1, 7, 8

18 U.S.C. § 3231................................................................................... 1

18 U.S.C. § 3742(a) ............................................................................. 1

28 U.S.C. § 1291................................................................................... 1

iv

## RULES

Fed. R. Evid. 402 ............................................................................ 16

Fed. R. Evid. 403 .......................................................................*passim*

Fed. R. Evid. 404 .......................................................................*passim*

# JURISDICTIONAL STATEMENT

Defendant-appellant's jurisdictional statement is not complete and correct.

Defendant was charged in a second superseding indictment with violations of 18 U.S.C. §§ 1956 and 1960. R. 173. [1] Defendant was convicted by a jury on all counts. R. 227, 231.

The district court sentenced defendant on all counts of conviction on November 4, 2022, and entered final judgment on December 27, 2022. R. 267, 270. On January 5, 2023, the district court entered an amended judgment. R. 275. Defendant timely filed a notice of appeal on January 5, 2023. R. 276.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

---

[1] Citations to the Original Electronic Record and Supplemental Record on appeal are designated as "R." followed by the district court document number. Volumes one through six of the trial transcript are cited as "Tr." followed by the page number. The trial transcript pages correspond to the district court docket numbers as follows: Tr. 1-52 (R. 210); Tr. 53-300 (R. 212); Tr. 301-509 (R. 215); Tr. 521-704 (R. 216); Tr. 705-859 (R. 220); and Tr. 860-1064 (R. 223). The remainder of the trial transcript (which are not included in the volumes listed above) are cited by the district court docket number followed by the page number. The transcript of the suppression hearing (R. 87, 90) is cited as "Supp. Hr'g Tr." followed by the page number. Citations to defendant's brief are designated as "Br." followed by the page number.

## ISSUES PRESENTED FOR REVIEW

1.     Whether the district court erred in denying defendant's motion to suppress evidence recovered from his home, based on a finding that his wife voluntarily consented to the search of their shared home.

2.     Whether the district court abused its discretion in admitting evidence of defendant's threats, which defendant made to collect money as part of the charged money laundering conspiracy and unlicensed money transmitting business.

3.     Whether remarks made by government counsel during closing argument, which discussed the evidence showing that defendant regularly interacted with strangers as part of his money laundering conspiracy and unlicensed money transmitting business, were improper, warranting a new trial.

## STATEMENT OF THE CASE

### *Offense Conduct*

Beginning around July 2017 and spanning several years, defendant worked as part of a money laundering organization to launder large amounts of money for drug trafficking organizations. On behalf of a boss in Mexico, defendant picked up drug proceeds in the Chicagoland area and then returned the money to the Mexico-based organization.

In the summer and fall of 2017, on approximately eight separate occasions, defendant received cash from an individual named Rafiq Roman, who was dealing kilogram-quantities of cocaine in the Chicagoland area. Tr. 155, 172. According to Roman, he transferred the proceeds from his drug sales to defendant so that the money could be returned to Roman's Mexico-based source of narcotics supply. Tr. 176-77. In exchange, Roman's source of supply continued to supply him with kilogram quantities of cocaine on credit. *Id.*

The cash pickups worked as follows: defendant provided a phone number, a serial number from a dollar bill, and a code name to a coconspirator, who, in turn, provided that information to Roman's point of contact, who passed it along to Roman. R. 172, 181-82. Defendant then met with Roman in public parking lots to pick up the drug proceeds, usually collecting anywhere from $100,000 to $200,000 at a time. Tr. 172-73, 177-78. There, defendant and Roman confirmed a serial number from the dollar bill—the same one that defendant had provided to his boss and Roman had received from his boss—to confirm they were meeting with the correct person. Tr. 167-69, 172-73. Once the parties' identities were confirmed, defendant took the cash, which was ultimately returned to the drug trafficking organization. Tr. 170-71; 176-77.

On November 9, 2017, Roman was arrested by law enforcement in possession of around $150,000 in drug proceeds. Tr. 9, 180. That evening,

Roman agreed to cooperate with law enforcement and he reached out to his boss, "Tio," and arranged to drop off his drug proceeds the following day. Tr. 180-81. His boss gave him a phone number for an individual going by "Sam" and a serial number from a dollar bill that Roman would use to confirm Sam's identity. Tr. 181. Roman called the phone number he was given—which turned out to be defendant's—and arranged the money pickup. Tr. 14-15.

The following day, defendant exchanged calls and text message with Roman to arrange the meeting. Tr. 181-84. Under law enforcement surveillance, Roman met with defendant in a public parking lot. Tr. 23. There, defendant accepted the cash from Roman—lookalike currency that law enforcement had substituted for the drug money Roman had the day before. Tr. 190, 362. In exchange, defendant gave Roman the dollar bill bearing the serial number Roman had received from Tio. Tr. 190-91. After the transfer, law enforcement stopped defendant. Tr. 23. In his car, defendant possessed a loaded gun and two magazines, approximately $200,000 in cash, and the lookalike currency Roman had just given him. Tr. 24-26.

With defendant detained, law enforcement proceeded to defendant's home, where they encountered defendant's wife, Jing Wang. Tr. 429. Law enforcement searched the residence based on Wang's consent. Supp. Hr'g Tr. 48, 98. During the search of the residence, agents recovered approximately $1.3 million in cash from the basement, much of which was stored inside cookie

tins in a drop-ceiling in the basement. Tr. 365-66. Law enforcement also recovered a large quantity of rubber bands, multiple ledgers, a money counter, and three firearms. Tr. 364-68.

Defendant was released by law enforcement (Tr. 30), and continued his money laundering activities, this time conducting cash pickups from another individual, Jason Mei. The cash transfers between defendant and Mei functioned a bit differently. On multiple occasions in the spring of 2018, Mei delivered cash—that he had picked up from unknown individuals and understood to be drug proceeds—to defendant. Tr. 764-66. Mei and defendant met in public places, and neither used their real names. Tr. 735, 772. Mei would provide defendant with wiring instructions so defendant could wire the equivalent amount of money to various Chinese bank accounts. Tr. 774, 843.

On June 1, 2018, unbeknownst to defendant, Mei was arrested and began cooperating with law enforcement. Tr. 726-27. That day, working with law enforcement, Mei met with defendant in a Starbucks to discuss Mei dropping off bulk cash to defendant. Tr. 726-29. Defendant then began the process of transferring to Chinese bank accounts the money he anticipated receiving from Mei. Tr. 777, 790-791. In the following days—while defendant awaited the cash transfer from Mei—defendant sent threats to Mei over the WeChat electronic messaging application and visited Mei's home to try to collect the money he was owed. Tr. 786, 792.

Ultimately, on June 4, 2018, Mei met with defendant in a parking lot. Tr. 729, 808. During that meeting, defendant and Mei discussed their prior business dealings and Mei told defendant about a fictitious seizure of 1,000 pounds of marijuana, which he represented as the reason for the delay for transferring the cash he had previously agreed to transfer to defendant. Tr. 809-12. Defendant then accepted the cash from Mei. Tr. 808. Law enforcement stopped defendant after the transaction and seized from defendant's car the cash Mei had given defendant—totaling $192,000—and a firearm. Tr. 371, 736.

Weeks later, on June 25, 2018, agents encountered defendant at his home to effectuate an arrest warrant. Tr. 65. Upon observing law enforcement agents, defendant hid inside of his home, fleeing to the second floor, before he was ultimately arrested. Tr. 66-67. That same day, agents obtained a search warrant for defendant's residence, and obtained defendant's cellular phones, rubber bands, and approximately $45,000 in cash underneath the insert of a garbage can and in clothing. Tr. 67-68.

### Charges Against Defendant

For this conduct, on June 21, 2018, defendant was charged by indictment. R. 1.

A later second superseding indictment charged defendant with:

- Conspiracy to commit money laundering between July 2017 and June 4, 2018, in violation of 18 U.S.C. § 1956(h) (Count One);

- Attempted concealment money laundering on November 10, 2017, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count Two);

- Conducting a financial transaction with funds represented by a confidential source to be proceeds from illegal activity, on June 4, 2018, in violation of 18 U.S.C. § 1956(a)(3)(B) (Count Three); and

- Operating an unlicensed money transmitting business between around January 2016 until June 4, 2018, in violation of 18 U.S.C. § 1960(a) (Count Four).

R. 173.

### *Motion to Suppress*

Defendant filed a motion to suppress the evidence seized from his residence on November 10, 2017. R. 48. Defendant argued that law enforcement's warrantless search of his home violated the Fourth Amendment because neither defendant nor his wife, Wang, voluntarily consented to the search. *Id.* at 1. Defendant asserted that he never gave law enforcement oral consent to search the home. *Id.* at 5. While acknowledging that Wang signed a written consent to search form, defendant argued that this consent was not voluntary. *Id.* Defendant asserted that law enforcement lied to Wang by telling her that her husband had already consented to the search and misrepresented that there might be dangerous items inside the home. *Id.* at 3. Defendant also

argued that law enforcement further coerced Wang's consent when officers stepped into the residence prior to obtaining Wang's consent. *Id.* In defendant's view, the combination of these "impermissible tactics" rendered Wang's consent involuntary. *Id.*

The government filed a response, asserting that the search of defendant's home was lawful because defendant provided oral consent to search his residence, and Wang also independently provided written and oral consent to search the residence. R. 49 at 13-17. The government emphasized that there was nothing coercive about the circumstances in which Wang's consent was obtained: after Wang voluntarily opened the door to law enforcement, officers explained to her that her husband had been arrested, answered her questions, and obtained her oral and written consent. *Id.* at 14.

The district court held a two-day evidentiary hearing on defendant's motion. At the hearing, the government called the law enforcement agents and officers who arrested Han on November 10, 2017, as well as those who subsequently interacted with Wang and searched the home. Supp. Hr'g Tr. 8-208. Both parties also relied upon videos from a home security camera at defendant's residence, which defendant had produced to the government prior to the hearing. App. 29. The videos depicted most of law enforcement's interactions with Wang, but contained several gaps, including the portion of

the interaction during which officers testified that Wang had consented. *See* App. 22.[2]

At the suppression hearing, two law enforcement officers testified that, after Wang opened the door to the home, they spoke with Wang near the entryway to obtain her consent to search the home. Supp. Hr'g Tr. 94. One officer stated that he stepped inside the home at some point during the initial conversation due to how cold it was outside that day. Supp. Hr'g Tr. 108. The officers explained to Wang that her husband was in custody and sought permission to search the home, at which point Wang provided her verbal consent. Supp. Hr'g Tr. 42-45, 48, 98. The officers never drew their weapons, raised their voices, or threatened Wang. Supp. Hr'g Tr. 42-44, 96, 104. Officers further testified that they later presented Wang with a consent to search form and obtained her written consent. Supp. Hr'g Tr. 53-54, 156-58.

Wang testified on defendant's behalf. She claimed she had not given law enforcement her verbal consent, but did not ask officers to leave because she

---

[2] The district court noted that the videos were recorded by defendant's home security cameras and provided to the government by defense counsel. App. 29. Regarding the fact that the video did not show the key portion of the officers' conversation with Wang in which she provided verbal consent, the district court stated: "if an inference were to be drawn that someone altered the tape, only the defense (and not the Government) had the opportunity to do so. Therefore, even though the video does not show Wang providing consent, given the circumstances, the Court cannot conclude that its omission from the video indicates that Wang did not consent." App. 29.

was afraid and because they had informed her that her husband "agreed or gave them permission for them to come inside." Supp. Hr'g Tr. 214.

On September 23, 2020, the district court denied defendant's motion to suppress evidence seized from his residence. App. 19-33. In its ruling, the court presented a detailed recitation of events surrounding the search of defendant's residence, as developed at the hearing. App. 19-25. After analyzing this evidence, the court found that Wang voluntarily consented to the search of the residence and denied defendant's motion accordingly. *Id*. at 10-15.

Along the way, however, the court found that the government had not satisfied its burden that defendant had provided consent to search his residence. It emphasized that the officers' testimony that defendant consented was "called into question by the lack of written documentation corroborating their claim." App. 26. It noted that contemporaneous law enforcement reports did not reflect that defendant had consented, and that defendant—unlike Wang—never signed a written consent form. App. 26-27.

As to Wang's consent, the court concluded she consented to the search, noting that the home surveillance video footage corroborated the officers' testimony regarding their interactions with Wang. App. 28-33. The court considered and rejected defendant's argument that Wang's consent was coerced and therefore involuntary. App. 30-33. Specifically, it found unpersuasive defendant's argument that officers falsely informed Wang that

her husband had already given consent, thus rendering her consent coerced. App. 31. The court acknowledged that this could be a factor cutting against voluntary consent, but found that the totality of the circumstances demonstrated to the contrary: Wang was never subject to physical force or threats, and was never detained or subjected to lengthy questioning. App. 32-33. The court described the initial exchange between Wang and the officers as "calm, controlled, and of relatively short duration." App. 32. The court also noted that Wang appeared able to communicate effectively with the officers, even "push[ing] back" on officers regarding certain aspects of their search. App. 32-33. The district court pointed out, for example, that Wang asked officers to allow her to pick up her older son at school before they seized her car and officers agreed. App. 24-25. One officer accompanied Wang, and, at her request, pretended to be an old college friend to avoid frightening Wang's son. *Id.*

### *Trial*

The case proceeded to a jury trial lasting over two weeks, with the government calling over a dozen witnesses.

The jury heard from multiple law enforcement witnesses who detailed their interactions with defendant and seizures made from defendant, including:

- Law enforcement's arrest of Roman on November 9, 2017, during which Roman was in possession of around $150,000 in drug proceeds, and Roman's agreement to cooperate by setting up a money transfer to defendant. Tr. 7-8, 15.

- Law enforcement's surveillance of the November 10, 2017 meeting between defendant and Roman, in which defendant accepted $100,000 in lookalike currency from Roman. Tr. 359-62.

- Law enforcement's subsequent stop of defendant, who possessed in his car a loaded gun and two magazines, $200,000 in cash, and the lookalike currency from Roman. Tr. 24-26.

- Law enforcement's search of defendant's home on November 10, 2017, during which agents recovered approximately $1.3 million in cash from defendant's basement, much of which was in cookie tins in a drop-ceiling in the basement; a large quantity of rubber bands and ledgers; and three firearms. Tr. 364-68.

- Law enforcement's arrest of Jason Mei on June 1, 2018, during which Mei was in possession of large quantities of cash and marijuana, and Mei's subsequent agreement to cooperate by setting up a meeting with an individual—who turned out to be defendant—to discuss a bulk cash transfer. Tr. 726, 728-29.

- Mei's June 4, 2018 meeting with defendant, in which defendant accepted the cash from Mei, which Mei represented to be drug proceeds. Tr. 807-12.

- Law enforcement's stop of defendant after his transaction with Mei, during which agents seized the $192,000 from Mei and a firearm from defendant's car. Tr. 371, 736.

- The government also presented expert testimony from a law enforcement agent who explained the system of money pickups used by international drug and money trafficking organizations. Tr. 325-35.

Two cooperating witnesses took the stand to recount their interactions with defendant: Rafiq Roman and Jason Mei.

Roman testified that in 2017, he sold kilogram quantities of cocaine in the Chicago area, supplied to him by his Mexico-based source of supply, Tio. Tr. 155. Roman testified about the instructions Tio gave him for the drug proceeds: when Roman had drug proceeds ready to deliver, Tio would provide him with the phone number and code name of the person to whom Roman was supposed to deliver the money, along with a serial number from a dollar bill to confirm the person's identity. Tr. 167-69.

According to Roman, using this system, he met with defendant—who Roman knew only as "Sam"—on approximately eight occasions in the summer and fall of 2017, each time transferring about $100,000. Tr. 168, 172, 177-79. Roman testified that he understood that the drug money made its way back to Tio in Mexico because Roman kept receiving the kilograms of cocaine from Tio, which had been provided on credit, and were paid for only by the money collected after their sale in the Chicago area. Tr. 176-77. Roman also knew that the money made its way back to Tio in Mexico because, on one or two instances, Tio received less than what Roman was supposed to have delivered to defendant and Roman had to make up the difference. Tr. 170-71. After Roman agreed to cooperate with law enforcement, he used this same system to deliver money to defendant on November 10, 2017. Tr. 181.

Mei testified that, in April 2018, he began collecting cash in increments of between $100,000 and $200,000, at the direction of an individual who told

him that the money was derived from the sale of marijuana. Tr. 764, 773. Mei then delivered the money that he had collected to defendant, who he knew only as "Hi Ho." Tr. 766. Mei would provide defendant with wiring instructions and defendant would wire the equivalent amount of money to Chinese bank accounts in other individuals' names. Tr. 774, 843.

In addition to testimony from law enforcement officials and cooperating witnesses, the jury saw and heard a number of exhibits that corroborated the testimony of the cooperators and established defendant's connection to international money laundering, including:

- Recordings and transcripts reflecting defendant's dealings with Roman on November 9 and November 10, 2017 and with Mei on June 4, 2018. Tr. 186-191, 803-806.

- Defendant's personal income tax returns for the tax years 2012 through 2016, which reflected that defendant reported a total income of $162,000 over that five-year time period (despite being in possession of approximately $1.3 million in his residence in 2017). Tr. 923.

- Defendant's communications, including call records and messages from various electronic applications. These showed telephonic contact between defendant and Mexico-based phone numbers in 2017 and 2018, including calls and messages made in close conjunction with defendant's interactions with Roman and Mei. R. 569-77.

- Series of phone communications between defendant and other individuals who were unidentified in defendant's phones, which reflected defendant and these unknown parties arranging to meet and using the serial-number system described by Roman and law enforcement witnesses. R. 556-67, 651.

### Threat Evidence

At trial, the government sought to admit evidence that, in an attempt to collect cash from Mei in relation to money he was laundering, defendant threatened Mei and his family. This evidence included Mei's testimony about the threats, electronic communications defendant sent to Mei over the WeChat application, and footage from Mei's home surveillance system, showing defendant arriving at Mei's residence the same weekend he was making repeated threats to Mei. App. 73-74.

Defendant objected to the introduction of evidence of defendant's threats to Mei, arguing that the threats were prohibited Rule 404(b) evidence, "extremely prejudicial," and not probative of the undisputed fact "that there was a money exchange" on June 4, 2018. App. 71. The court heard from both parties on the issue. App. 71-72.

The government argued that the threat evidence was relevant not only to the count charging defendant's transaction with Mei on June 4, 2018, but as part of the charged money laundering conspiracy and operation of an unlicensed money transmitting business. App. 71, 73. The government reasoned that the threats to Mei "make it more likely that [defendant] was involved in money laundering because if he were a legitimate electronics salesman operating a small business, he would be unlikely to threaten people in connection with the receipt of $192,000." App. 71. For his part, defendant

asserted that the threats merely reflected him trying to collect the money that Mei owed him "for the products [electronics]," and that the evidence was unduly prejudicial. App. 72. After asking several follow-up questions, the court ruled that the evidence could be admitted, reasoning as follows:

> As proffered by the government, this is being offered as evidence of the actual conspiracy that's charged in Count 1. They are attempting to lay the groundwork to make the argument to the jury that these are actions Mr. Han took in furtherance of that conspiracy, so I don't think it qualifies as 404(b) evidence.
>
> I appreciate that Mr. Leonard [defense counsel] believes that he's going to develop an argument that will show that these acts were not taken in furtherance of any such conspiracy, but that's what the jury is going to decide.
>
> So I think the concerns that you've raised, Mr. Leonard, can be addressed on cross-examination, and ultimately, the jury will decide. I don't think it's 404(b), so I'm going to allow it to be introduced."

App. 74.

Prior to the evidence being admitted at trial, defendant raised the objection again, and the district court made clear that it was overruling all objections based on Rules 402, 403, and 404(b), "for the same reasons" the court had articulated earlier. Tr. 770.

The government proceeded to introduce WeChat communications between defendant and Mei between June 1, 2018 and June 4, 2018, which showed defendant threatening Mei to collect the cash that defendant was in the process of laundering for Mei. Tr. 776-77, R. 307 (Gov't Ex. 229T). In those

messages, defendant threatened Mei, demonstrating that he knew Mei's real name, Mei's father's name, Mei's girlfriend's name, and each individual's birth year—information Mei had never given defendant. Tr. 788. Defendant told Mei that "someone will come." Tr. 786, R. 307 at 21. Mei testified that he believed defendant "would have someone to come after my family." Tr. 787.

The government also introduced surveillance video of Mei's home, which showed defendant going to the home during the same time as he was sending the threatening communications about the collection of money. Tr. 733, 791-93.

### Verdict and Sentencing

The jury returned a verdict convicting defendant on all counts of the second superseding indictment. R. 231.

After the trial, defendant filed a motion for judgment of acquittal under Rule 29, arguing that the evidence presented at trial was insufficient to support a conviction on all four counts. R. 235. Defendant also sought a new trial, asserting various bases for relief, including that: the district court erroneously denied defendant's motion to suppress evidence seized on November 10, 2017; the district court erred in several of its evidentiary rulings, including admitting the threats defendant made to Jason Mei; and the government's comments in closing argument were improper. R. 234.

The district court denied both motions, concluding that the government had presented sufficient evidence to support the jury's conviction, and rejecting each of defendant's pretrial and trial challenges. App. 34-70. Specifically, as to defendant's challenge based on the court's denial of his motion to suppress, the court noted that defendant raised the same arguments he had in his suppression motion and found no reason to "reconsider the prior ruling." App. 50-51. Nor was the court persuaded it had erroneously admitted the evidence of defendant's threats to Mei, explaining that "Han's threatening communications to Mei were relevant and probative evidence reflecting Han's knowledge that the funds he expected Mei to deliver to him were the proceeds of some unlawful activity." App. 60.

Finally, the district court rejected defendant's contention that the government's statements during its rebuttal closing argument about defendant's texts with unidentified individuals were improper. App. 68. In particular, the district court disagreed with defendant that the government's statements "improperly suggested to the jury that Han had the burden to prove the identity of the individuals with whom he was messaging," or otherwise "amount[ed] to commentary on Han's decision not to testify." *Id.* In concluding that the government's statements in rebuttal were proper, the district court explained that the government was "responding to Han's attack on the weight

of the text message evidence by noting that the record contained no suggestion that the individuals were anything but strangers to Han." *Id.*

The district court subsequently sentenced defendant to 84 months' imprisonment. R. 270.

## SUMMARY OF ARGUMENT

Defendant's challenges on appeal lack any merit and his conviction and sentence should be affirmed.

First, the district court properly denied defendant's pretrial motions to suppress evidence seized from his home on November 10, 2017. The district court's factual finding that defendant's wife, Wang, voluntarily consented to the search was well supported by the record. The district court carefully evaluated the testimony and evidence presented at the suppression hearing, and found, in light of the circumstances as a whole, that Wang's consent was voluntary. This finding was not clearly erroneous.

Second, the district court did not abuse its discretion in admitting evidence of defendant's threats to Mei. The threat evidence was properly admitted under Rule 403 of the Federal Rules of Evidence, and, as evidence of the charged crimes, the evidence did not implicate Rule 404(b) of the Federal Rules of Evidence. Defendant's threats were highly probative of his participation in illegal money laundering and the operation of an unlicensed money transmitting business, in that these threats made it much more likely

that defendant was engaging in unlawful money transfers, as opposed to buying and selling electronics as part of a legitimate business. The threat evidence was also highly revealing as to defendant's state of mind—namely, his understanding that the money he was moving for Mei was drug money. This high probative value was not substantially outweighed by any risk of unfair prejudice.

Finally, none of the challenged remarks made by government counsel during closing arguments was improper. At closing, government counsel accurately discussed the trial evidence showing defendant transacting with strangers as part of his money laundering conspiracy and unlicensed money transmitting business, as reflected in defendant's text message communications. And in response to defendant's arguments about the weight the jury should afford these communications—including the government's failure to identify the individuals with whom defendant was interacting—government counsel pointed out that defendant himself did not know these individuals because collecting money from strangers was part of his money laundering activities. In any event, none of the challenged remarks could have affected the jury's verdict.

# ARGUMENT

## I. The District Court Properly Denied Defendant's Motion To Suppress Evidence.

### A. Standard of Review

In reviewing the denial of a motion to suppress, this Court reviews the district court's findings of fact for clear error and its legal conclusions *de novo*. *United States v. Johnson*, 93 F.4th 383, 387 (7th Cir. 2024).

"Clear error exists only when after considering all the evidence, we cannot avoid or ignore a definite and firm conviction that a mistake has been made." *United States v. Mercado*, 53 F.4th 1071, 1085 (7th Cir. 2022) (cleaned up). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. McGraw*, 571 F.3d 624, 629 (7th Cir. 2009).

### B. Analysis

Defendant argues that the district court erred in finding that his wife, Wang, voluntarily consented to the search of their home on November 10, 2018.[3] Defendant points to various factors—including officers' representations to Wang and their action of stepping into the entryway of the home before Wang provided her consent—and argues that, in combination, they rendered

---

[3] Defendant did not contest below and does not contest here that Wang, defendant's wife who lived at the family home with him and was present when officers arrived, had authority to consent to a search of the premises. *See* App. 28.

Wang's consent involuntary. Br. 14. The district court, after presiding over a two-day suppression hearing and considering the same factors defendant raises here, concluded otherwise. This finding was not clearly erroneous.

Voluntary consent is a "well-recognized exception to the Fourth Amendment's warrant requirement." *United States v. Jones*, 22 F.4th 667, 675 (7th Cir. 2022). The issue of whether consent is voluntary is a factual determination based on the totality of the circumstances, and reviewed by this Court for clear error. *Id.* The government bears the burden of proving by the totality of circumstances that consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). In assessing the voluntariness of a consent to search, the following factors are considered: "(1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent." *United States v. Ambriz-Villa*, 28 F.4th 786, 790 (7th Cir. 2022). No single factor is dispositive. *Jones*, 22 F.4th at 676.

At the suppression hearing, law enforcement officers testified that Wang provided her oral (and later) written consent. Supp. Hr'g Tr. 42-45, 48, 53-54, 98, 156-58. The officers described Wang's demeanor as calm, and explained

that they never drew their weapons, raised their voices, or threatened Wang. Supp. Hr'g Tr. 42-44, 96, 104. The district court found this testimony credible, and emphasized it was corroborated, at least in part, by various segments of footage from defendant's home surveillance system, which depicted a calm and controlled interaction between Wang and the officers. App. 29.

Defendant contends that officers represented to Wang that Han had already consented to the search, thereby asserting a "claim of authority" based on a "false pretense." Br. 17. Defendant underscores the district court's finding that the government had not met its burden in demonstrating that defendant himself had consented to the search. Br. 14. In addressing this argument below, the district court concluded that, while officers' statements to Wang about her husband's previously consenting might weigh against her voluntary consent, it did not render her consent involuntary, in light of the circumstances as whole. App. 32.

An "improper claim of police authority," may be a factor weighing against consent, but the inquiry remains "whether such claims of authority outweigh the other factors suggesting consent was voluntary." *McGraw*, 571 F.3d at 629-30 (cleaned up). In *McGraw*, for instance, officers "implied that they had a right to search [defendant's] apartment without his permission" by advising defendant that his apartment had been condemned and they needed to enter the apartment to inspect it. *Id.* at 629. While recognizing this militated against

consent, the court nonetheless found voluntary consent based upon defendant's "calm cooperation, and his broadly phrased consents following [the officer's] unambiguous request to inspect his apartment." *Id.* at 630; *see also Jones*, 22 F.4th at 676 (concluding consent was voluntary where "officers did not use or threaten the use of physical force, spoke in conversational tones" and asked to enter the premises "only twice").

The record is similar here. While officers represented to Wang that defendant had already consented to the search of the residence, officers proceeded to seek Wang's written and verbal consent. Supp. Hr'g Tr. 42-45, 48, 98. The district court observed that, "[a]s captured on partial video, the exchange between Wang and the officers appeared calm, controlled, and of relatively short duration." App. 32. The court also found significant that Wang was a 40-year-old college-educated woman, was not detained or in custody at any point, was not subject to any physical coercion or even raised voices, and "appear[ed] to have consented immediately." App. 30.

The other two circumstances pointed out by defendant—the officers' statements to Wang that there could be firearms in the house, and the fact that officers stepped into the entryway of the home prior to Wang providing her consent (Br. 14)—fall well short of rising to the level of coercion. This Court has concluded that even a forceful entry and protective sweep does not necessarily vitiate an individual's ability to freely consent. *See e.g.*, *United*

States v. Contreras, 820 F.3d 255, 270 (7th Cir. 2016). Much more is necessary for officers' actions in entering a residence to render consent involuntary. *Compare United States v. Arrellano*, 757 F.3d 623, 635 (7th Cir. 2014) (noting defendant's consent was involuntary because it was obtained only after officers "pounded on [the residence's] doors and windows for nearly an hour," and then "rushed in and conducted a protective sweep of every one of its rooms") *with United States v. Taylor*, 31 F.3d 459, 462-63 (7th Cir. 1994) (affirming district court's finding of voluntary consent, despite the fact that eight officers arrived with weapons drawn, conducted a protective sweep of the building, and briefly handcuffed defendant before he provided consent). Viewed in light of this caselaw, one officer's statement that there might be guns in the home (which turned out to be true) and another's action of stepping into the entryway of the home and standing beside Wang after she opened the door, do not come close to undermining Wang's ability to voluntarily consent.

And, regardless, the district court expressly considered these facts, and still found that the record as a whole showed that Wang's consent was voluntary. In particular, the district court found unconvincing Wang's testimony that "she was afraid to refuse the officers." App. 33. This Court generally defers to a district court's credibility determinations at hearings, recognizing that, "unlike our review of transcripts, the district court had the opportunity to listen to testimony and observe the demeanor of witnesses."

*United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007*); see also United States v. Olson*, 41 F.4th 792, 802 (7th Cir. 2022). ("[D]eterminations of witness credibility can virtually never be clear error."). In so finding, the district court reasoned that Wang "pushed back regarding certain aspects" of the search, including telling officers she did not wish to disturb her napping child and protesting the officers' seizure of the car. App. 33. Notably, Wang also requested that officers allow her to use the car to pick up her older son from school and convinced the officer accompanying her to pretend to be her college friend so as to not alarm her son, which the officer did. App. 24-25. In the district court's view, Wang's ability "to object to the officers' actions on multiple occasions," undermined her testimony that she was too scared to refuse consent. App. 33.

Finally, defendant asserts that the "officers' presence in the residence prior to receiving any consent to enter" means that, even if Wang's consent were voluntary, suppression of the evidence recovered in the home would still be warranted. Br. 20. Defendant relies upon *United States v. Johnson*, a case in which consent was given after police entered into the threshold of defendant's home and an officer unlawfully seized defendant by drawing his weapon and ordering defendant not to move. 427 F.3d 1053, 1056 (7th Cir. 2005). In concluding that the subsequent search was unconstitutional, this

Court emphasized that "the unlawful seizure was ongoing when [defendant] voiced his consent." *Id.* at 1057.

The district court roundly rejected this same argument below, stating that it was "not persuaded that [the officers] violated the Fourth Amendment by merely stepping over the threshold of the front door and standing next to Wang in the entryway." App. 31. The district court credited the officers' testimony that "they stepped into the doorway in part to seek warmth, as it was very cold outside." *Id.* The district court further explained: "consent may be manifested in a nonverbal manner," and here, Wang opened the door and allowed the officers into the threshold of the home. *Id.* While "one does not consent to the government entering his home by simply answering the door," this Court "on more than one occasion, has found that the act of opening a door and stepping back to allow entry is sufficient to demonstrate consent." *United States v. Sabo*, 724 F.3d 891, 894 (7th Cir. 2013); *see also United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000) ("[A]ction in opening the door and stepping back to allow the entry was sufficient to convey her consent in these circumstances."). The district court correctly concluded that, in light of Wang's nonverbal cues, the officers' action of stepping inside while speaking with Wang did not create a Fourth Amendment violation. *See e.g.*, *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004) ("An explicit verbal consent or any other form of affirmative invitation to enter a dwelling is not necessary to

constitute consent for purposes of the Fourth Amendment.") (cleaned up); *United States v. Raibley*, 243 F.3d 1069, 1077 (7th Cir. 2001) (concluding that defendant's shrug of the shoulders, combined with his subsequent actions, permitted an inference of consent).

Defendant's efforts to have this Court reweigh the relevant factors, reevaluate the credibility of witnesses' testimony, and reconstrue the evidence should be rejected. The testimony supporting the district court's decision was credible and corroborated, and the district court appropriately weighed the totality of the circumstances in finding that Wang's consent to search was voluntary. *See McGraw*, 571 F.3d at 630 (framing the inquiry as whether a finding of consent was "plausible in light of the record viewed in its entirety").

## II. The District Court Properly Admitted Evidence Of Defendant's Threats As Direct Evidence Of Charged Crimes.

### A. Standard of Review

This Court reviews the district's court's decision to admit or exclude evidence for an abuse of discretion. *United States v. Johnson*, 89 F.4th 997, 999 (7th Cir. 2024).

### B. Analysis

On appeal, defendant argues that the district court abused its discretion in admitting evidence of the threats he made to Jason Mei. Br. 25-31. In defendant's view, the evidence of defendant's threats was impermissible Rule

404(b) other-acts evidence, because they had "absolutely nothing to do with any of the crimes charge[d] against Han." Br. 26. Defendant further asserts that, under Rule 403, the evidence was unfairly prejudicial. Br. 29. These contentions lack merit.

Rule 404(b) excludes evidence of a "crime, wrong, or other act" if used to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," or in other words, if used as propensity evidence. Fed. R. Evid. 404(b)(1). But the rule does not apply to evidence that is "part and parcel of the circumstances" surrounding the crime. *United States v. Cardena*, 842 F.3d 959, 983 (7th Cir. 2016). Likewise, threats made in furtherance of a charged conspiracy are not Rule 404(b) evidence. *See United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001) ("The district judge did not abuse his discretion in concluding that [defendant] threatened [someone else] in furtherance of the conspiracy's objective of protecting itself (and its members) from criminal prosecution.").

The district court properly admitted evidence of defendant's threats made to Mei as part of an anticipated money transfer. Defendant's threatening statements to Mei, made in the course of the conspiracy and as part of defendant's dealings with Mei, were not Rule 404(b) evidence, as defendant contends. Br. 25-29. Rather, they were "direct evidence" of the charged crimes. *See United States v. Thomas*, 986 F.3d 723, 730 (7th Cir. 2021). Namely,

defendant's threats to Mei were probative evidence of defendant's money laundering conspiracy (Count One); his June 4, 2018 transaction with Mei with funds represented to be drug proceeds (Count Three); and his unlicensed money transmitting business (Count Four). *See* R. 173. Because defendant's threats were "direct evidence," Rule 404(b) was "not implicated." *Thomas*, 986 F.3d at 730.

Here, in response to a delay by Mei in transferring the anticipated $192,000, defendant repeatedly threatened Mei over WeChat communications. Tr. 785-88, R. 307 (Gov't Ex. 229T). For example, defendant made clear he knew personal information about Mei that Mei had never provided him, including Mei's real name and family composition: "Jason Mei. . . This isn't you, is it? You may continue. Someone will come. Continue to hide. Two sons. And the girlfriend also has a son. Excellent. It is fine. I will not contact you again, someone else will." Tr. 786, R. 307 at 20-22.

These threatening communications made it more probable that defendant was part of an organization engaged in a money laundering conspiracy and that defendant was operating an unlicensed money transmitting business. Defendant's threats were not introduced to show that defendant was "a bad guy," or "potentially violent," as defendant posits. Br. 26. Rather, the government introduced the communications between defendant and Mei to demonstrate conduct consistent with defendant's participation in

illegal money laundering and the operation of an unlicensed money transmitting business. In his opening statement, defense counsel represented that defendant operated a cash-based electronics business in which he bought Apple products in the United States and sold them in China. R. 241 at 161-62. Defendant continued to develop this theory at trial, including introducing tax returns from an electronics business held in his name. Tr. 992, 1009. The government was entitled to prove that defendant's dealings were instead more likely those of someone transacting in unlawful funds and involved with others who were willing to use force to collect cash. At bottom, defendant's threats to Mei were "part and parcel," *Cardena*, 842 F.3d at 983, of his money laundering conspiracy and unlicensed money transmitting business: defendant needed to collect the money Mei owed him, money that defendant had already sent to Chinese bank accounts to be laundered as part of his role in laundering dirty money.

So, too, were defendant's threats significant evidence as to defendant's state of mind—namely, defendant's belief that the money involved in his June 2018 transaction with Mei was drug proceeds. Contrary to defendant's estimation that "there is absolutely no reason to believe [defendant] would be less likely to make such threats over money he believed owed to him from a lawful source than he would money that he believed owed from an unlawful source," defendant's threats spoke volumes about the type of transaction

defendant believed he was undertaking. A reasonable jury could well conclude that someone dealing in lawful business would seek recourse through means other than threatening violence—such as by contacting law enforcement or filing a civil complaint.

Defendant's Rule 403 argument is similarly unavailing. Under Rule 403, a court may exclude relevant evidence only "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. This Circuit has recognized that "most relevant evidence is, by its very nature, prejudicial," and has therefore "emphasized that evidence must be unfairly prejudicial to require exclusion." *United States v. Chanu*, 40 F.4th 528, 545 (7th Cir. 2022). Evidence creates a danger of unfair prejudice if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Rogers*, 587 F.3d 816, 822 (7th Cir. 2009). The high probative value of the evidence—which illuminated defendant's relationships with coconspirators and his understanding of the illegal nature of the funds he was picking up from Mei— was not substantially outweighed by a danger of "unfair prejudice by leading a jury to draw conclusions based on propensity." *United States v. Gomez*, 763 F.3d 845, 857 (7th Cir. 2014) (*en banc*); *see also Thomas*, 986 F.3d at 728 ("Direct evidence of a crime is almost always admissible against a defendant.").

Defendant contends that his statements to Mei were "chilling" and would incentivize the jury to decide the case based on emotion rather than evidence. Br. 27. But the government was not required to present a sanitized version of defendant's crimes with gaps as to defendant's interactions with Mei. *See Gomez*, 763 F.3d at 857-58 ("[T]he prosecution is entitled to prove its case by evidence of its own choice."); *United States v. McKibbins*, 656 F.3d 707, 711 (7th Cir. 2011) ("The Federal Rules of Evidence do not limit the government to the 'most' probative evidence."). Evidence of threats or violent acts may be admissible—notwithstanding its prejudice to defendant—when it is probative as to the charged offense. *Compare United States v. Hicks*, 368 F.3d 801, 807 (7th Cir. 2004) (in a drug conspiracy case, concluding admission of evidence of the uncharged murder of a drug dealer was proper because "it tended to show [co-conspirator's] control over the crack houses and the dealers" and went towards proving the conspiracy) *with United States v. Castro-Aguirre*, 983 F.3d 927, 936 (7th Cir. 2020) (concluding the district court abused its discretion in admitting evidence of the kidnapping and murder of defendants' drug supplier by other members of the cartel because the evidence "had little to do with the conduct for which the defendants were being tried").

For example, in *United States v. Jackson*, defendant took issue with the district court's admission of evidence "that he threatened to kill one of his drug distributors if they cooperated with law enforcement," arguing—as defendant

does here—that "the insidious image of [defendant] threatening cold-blooded murder infected the whole trial." 898 F.3d 760, 764 (7th Cir. 2018). This Court disagreed, recognizing that the "threat evidence no doubt had an impact on the jury" but concluding that the evidence was important because it established the defendant's participation in the conspiracy and explained how he was able to "keep control of the heroin distribution." *Id.* at 764-65.

Here, as discussed above, defendant's threats to Mei constituted highly probative evidence of both his participation in the money laundering conspiracy and unlawful money transmitting business, as well as his knowledge that he was participating in financial transactions with funds derived from illegal activity. In applying Rule 403, "[o]ne important issue" is the extent to which the fact "actually is contested in the case." *Gomez*, 763 F.3d at 857. Defendant's theory at trial was that he was an electronics salesman who dealt in cash as part of a legitimate business. R. 241 at 161-62. The key contested issue, therefore, was not whether these cash transactions occurred, but what defendant knew and believed about the nature of the money he was moving.

Defendant further contends that the district court also erred in not "clearly articulating its Rule 403 rationale" before admitting the threat evidence. Br. 30. A district court must "clearly articulat[e] its Rule 403 rationale before admitting adverse character evidence against a defendant."

*United States v. Miller*, 688 F.3d 322, 327 (7th Cir. 2012). While the district court did not recite the Rule 403 standard and perform an explicit balancing test on the record, this Court's focus on review is more practical: "a district court should carefully analyze the prejudicial effect, and provide a considered explanation of its reasons for admitting the evidence." *Id.* at 328 (cleaned up.)

Here, the district court engaged in a colloquy with the parties regarding the relevancy and prejudice of the threat evidence. App. 71-74. It concluded that the threats were "evidence of the actual conspiracy" and defendant's concerns about the evidence could "be addressed on cross-examination." App. 74. The district court's balancing analysis was implicit in its conclusion about the evidence's relevancy to the charged crimes and explanation that defendant's concerns could be appropriately addressed on cross-examination, especially in light of the court's colloquy with the parties. *See Thomas*, 986 F.3d at 730 ("Although the district court did not explicitly engage in this balancing [under Rule 403], implicit in its description of the highly probative nature of this evidence was a finding that it did not unfairly prejudice the defendant.").

## III. The Challenged Remarks Of The Government During Closing Argument Were Not Improper And Could Not Have Had An Adverse Effect On The Verdict.

### A. Standard of Review

Improper statements during closing arguments rarely require reversal. *United States v. Chavez*, 12 F.4th 716, 728 (7th Cir. 2021). Where, as here,

defense counsel did not object to the government's remarks contemporaneously, this Court reviews the claim for plain error. *United States v. Young*, 470 U.S. 1, 14-16 (1985). In this context, plain error requires a defendant to show that the comments were "obviously" or "clearly improper," such that not only was he deprived of a fair trial, "but also that the outcome of the trial probably would have been different absent the prosecution's remarks." *United States v. Chaparro*, 956 F.3d 462, 484 (7th Cir. 2020).

## B.     Analysis

Defendant asserts that the government's statements that defendant did not know the individuals with whom he was conducting money transfers constituted an improper comment on defendant's silence, violating his right against self-incrimination. Br. 22. Specifically, defendant takes issue with the following statement made by the government during its rebuttal closing argument: "Now you heard defense counsel talking about the phone evidence and how Special Agent Jennings wasn't able to identify every person in those text messages that was put forward, but neither was defendant." Br. 24 (citing R. 243 at 185). Viewed in context, however, government counsel's remarks on the probative value of defendant's text message communications were entirely proper.

The Court applies "a two-step analysis to determine whether remarks made during closing argument require reversal of a conviction. 'First, we

consider whether the challenged remark was improper, and second, whether the remark deprived the defendant of a fair trial.'" *Jackson*, 898 F.3d at 765 (quoting *United States v. Wolfe*, 701 F.3d 1206, 1211 (7th Cir. 2012)). The second step of the inquiry is "informed by five factors:"

> "(1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to which any prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction."

*Id.*

Defendant's challenge fails at the first step, as the challenged remarks were proper. Defendant does not contend that the government directly commented on his right to remain silent, Br. 22, and "absent such direct comment, the right against self-incrimination is violated only when (1) it was the prosecutor's manifest intention to refer to the defendant's silence, or (2) the remark was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's silence." *United States v. Tanner*, 628 F.3d 890, 899 (7th Cir. 2010) (cleaned up). Neither circumstance is present here.

During opening closing argument, the government pointed to evidence from defendant's phone demonstrating that he was conducting an unlicensed money transmitting business. To prove this offense, the government was required to show that defendant was transmitting money "on behalf of the

public." R. 243 at 87. The government explained this requirement: "you're not using your own money or your family's money or your friend's money, but you're doing transactions with customers." *Id.* at 116. Government counsel then pointed to evidence of defendant's text messages in support of this element: "There was evidence from defendant's phone of him sending addresses, in particular, a McDonald's near his home, of using the code name Sam and of receiving serial numbers from dollar bills. Defendant didn't know these people. These were his customers for his unlicensed money transmitting business." *Id.* at 117. Government counsel accurately summarized the evidence showing that defendant was not engaging in isolated money transfers on behalf of close friends or family members, but instead laundering dirty money for strangers. Defense counsel did not object to these statements.

In defendant's closing argument, defense counsel urged the jury to discount the evidence of defendant's text messages. Defense counsel referred to the evidence as "meaningless" because law enforcement had not been able to identify the individuals with whom defendant had been communicating. *Id.* at 165. Defense counsel emphasized that the government has "had five years, five years to identify one of these people in the text to prove to you jurors that there was something illicit going on with any of the people that Mr. Han was texting with." *Id.* at 166. Defense counsel further stressed that the law

enforcement witness could not "tell you whether the people he didn't bother to identify ever met with Mr. Han." *Id.*

In rebuttal, government counsel first noted that "[d]efense counsel also talked about corroboration during his closing argument," and then responded to defendant's argument that the evidence from defendant's phone communications were uncorroborated and therefore proved little. *Id.* at 184-85. Government counsel stated, "Now you heard defense counsel talking about the phone evidence and how Special Agent Jennings wasn't able to identify every person in those text messages that was put forward, but neither was defendant. Defendant can't tell you who those people were because they were strangers. Defendant was making arrangements with strangers to meet in parking lots." *Id.* at 185. Government counsel additionally underscored that those text messages "show[ed] that defendant was repeatedly engaging in the business of picking up money." *Id.* at 186. Defense counsel did not object to any of these statements.

Taken in this context, government counsel's remarks in rebuttal are best understood, as the district court found, "as responding to Han's attack on the weight of the text message evidence by noting that the record contained no suggestion that the individuals were anything but strangers to Han." App. 68. In considering whether a remark is improper, a court cannot "lightly assume" that "a prosecutor intends an ambiguous remark to have its most damaging

meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *United States v. Alviar*, 573 F.3d 526, 543 (7th Cir. 2009). Government counsel's remarks during rebuttal on the probative value of defendant's text message communications—specifically that these messages showed that defendant dealt with strangers to launder money—were a response to defense's counsel's comments on the weight of the text message evidence and were in no way improper. *See e.g.*, *United States v. McKenzie*, 922 F.2d 1323, 1327 (7th Cir. 1991) (emphasizing that the disputed statement was made during rebuttal and concluding that the "context suggests that the Government merely was editorializing on the weaknesses in [defendants'] argument rather than commenting on Defendants' failure to testify").

But even if the prosecutor's remarks were considered improper, defendant would only be entitled to a new trial if the "prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks and citation omitted). The remarks relied upon by defendant cannot meet this standard. Defendant faces another hurdle: under plain error review, he must also show that "the outcome of the trial probably would have been different absent the prosecution's remarks." *Chaparro*, 956 F.3d at 484.

The district court instructed the jury that the government had the burden of proof, and that defendant was not required to produce any evidence. R. 243 at 70. Throughout closing argument, government counsel stated multiple times that the burden remained with the government. *Id.* at 90, 176-77. The court also instructed the jury that the attorneys' arguments were not evidence. *Id.* at 71. Because juries are presumed to follow such instructions, any error was cured. *See United States v. Miller*, 276 F.3d 370, 375 (7th Cir. 2002) ("Even assuming that the prosecutor's remark was somehow improper, the district court's jury instructions cured any possible impropriety.").

Finally, any error was harmless, because defendant's conviction was supported by overwhelming evidence, including the testimony of over a dozen witnesses, evidence about bulk cash totaling over $1.3 million dollars seized from defendant's home, records of defendant's communications about his unlawful money transfers, and recordings of defendant's interactions with cooperating witnesses. *See Alviar*, 573 F.3d at 543.

# CONCLUSION

For the above reasons, this Court should affirm defendant's convictions and sentence.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

STUART FULLERTON
Assistant United States Attorney
Criminal Division

/s/ *Alexandra Morgan*
ALEXANDRA MORGAN
Assistant United States Attorney

# RULE 32 CERTIFICATION

I hereby certify that:

1. This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because it contains 9,476 words.

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Alexandra Morgan*
ALEXANDRA MORGAN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-1123

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2024 I electronically filed the foregoing

Brief of the United States with the Clerk of the Court for the United States

Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify

that all participants in the case are registered CM/ECF users and that service

will be accomplished by the CM/ECF system.

Respectfully submitted.

By: /s/ *Alexandra Morgan*
   ALEXANDRA MORGAN
   Assistant United States Attorney
   219 South Dearborn Street, 5th Floor
   Chicago, Illinois
   (312) 353-1123